

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

ENTERED
07/22/2008

| | | |
|---|---|---|
| IN RE: | § | |
| | § | **CASE NO. 07-35147** |
| AMANDA BRODOWSKI, | § | |
| | § | |
| Debtor. | § | |

**MEMORANDUM OPINION ON WELLS FARGO BANK, N.A.'s
OBJECTION TO CONFIRMATION OF DEBTOR'S AMENDED PLAN**
[Docket No. 54]

## I.    Introduction

Amanda Brodowski (the Debtor) filed an amended Chapter 13 plan which proposes to bifurcate the claim of Wells Fargo Bank, N.A. (Wells Fargo). This claim is related to the 2006 purchase of a new vehicle and the trade-in of a 2004 vehicle. The proposed plan treats the negative equity arising from the trade-in of the 2004 vehicle as an unsecured claim. Wells Fargo objects to this treatment and asserts that it has a fully secured claim, including the portion of the borrowed amount used to pay off the Debtor's loan on the trade-in vehicle. This contested matter requires the Court to interpret the so-called "hanging paragraph" which was added to 11 U.S.C. § 1325 as part of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 (BAPCPA). Since the passage of BAPCPA, several dozen bankruptcy courts, and a handful of district courts, have addressed the treatment of negative equity under § 1325. A slight majority of these cases has held that negative equity is not subject to a purchase-money security interest (PMSI).[1] Three of the four

---

[1]    In preparing this Memorandum Opinion, the Court reviewed the holdings in 38 opinions from various jurisdictions. Of these opinions, 20 found that negative equity was not part of the PMSI. While this is only a portion of all published opinions on the issue, the sample size is sufficiently large that the Court is confident in describing this position as the "slight majority." *See In re Hernandez*, Case No. 07-91687, 2008 Bankr. LEXIS 1712, at * 3 (Bankr. C.D. Ill. June 9, 2008) (stating that this was the majority position without any qualification); *see also In re Peaslee*, 373 B.R. 252, 255 (W.D.N.Y. 2007) (stating that "no clear consensus on that issue has yet emerged"); *but see In re Bradlee*, No. 07-30527, 2007 Bankr. LEXIS 3863, at *5 (Bankr. W.D. La. Oct. 10, 2007) (including negative equity in the PMSI

bankruptcy courts within the Fifth Circuit to consider this issue have followed this majority position.[2] For the reasons stated herein, this Court joins its sister courts from the Northern, Southern, and Western Districts of Texas in the ranks of the majority.

Although these three cases agree that negative equity should not be included in PMSI and therefore not protected by § 1325, they are split on how to handle the portion of the claim representing negative equity.   In *Sanders*, Bankruptcy Judge Leif Clark did not apply the transformation rule, but arrived at an interpretation of § 1325 which results in an identical outcome—none of the claim is subject to a PMSI and therefore the entire claim is subject to cram down under § 506. *In re Sanders*, 377 B.R. 835, 858 (Bankr. W.D. Tex. 2007).  Conversely, in *Dale* and *Steele*, Bankruptcy Judges Karen Brown and Michael Lynn both followed the dual-status rule and prorated the prepetition payments made under the loan to determine what amount of the claim is still secured by the PMSI and what amount is non-PMSI. *In re Dale*, No. 07-32451, slip op. at 12 (Bankr. S.D. Tex. 2007); *In re Steele*, Case No. 08-40282, 2008 Bankr. LEXIS 1851, at *26 (Bankr. N.D. Tex. June 12, 2008).  This Court respectfully disagrees with Judge Clark and follows the dual-status rule.

## II.     Findings of Fact

1.      On July 24, 2006, the Debtor purchased a 2006 Nissan Altima ("the 2006 car").   In connection with this transaction, the Debtor traded in her 2004 Mazda Rx-8 ("the 2004

---

and protecting the entire claim from § 506(b) is "the emerging majority" position).

[2] *In re Sanders*, 377 B.R. 836 (Bankr. W.D. Tex. 2007); *In re Dale*, No. 07-32451, slip op. (Bankr. S.D. Tex. 2007); *In re Steele*, Case No. 08-40282, 2008 Bankr. LEXIS 1851 (Bankr. N.D. Tex. June 12, 2008); *but see Bradlee*, 2007 Bankr. LEXIS 3863.

car"). In order to complete this transaction, the Debtor executed a retail installment contract (the "Contract"). [Ex. A / Doc. No. 73-2.]

2. The Contract was subsequently assigned to Wells Fargo, which perfected its interest in the 2006 car by having its lien noted on the title.  [Exs. B and C.]

3. The cash price of the 2006 car was $20,450.00, plus sales tax of $106.25. [Ex. A.]

4. The Contract reflects a trade-in balance owing on the 2004 car of $29,705.00. [Ex. A.]  A trade-in allowance of $17,000.00 was applied to this indebtedness.  Thus, the net trade-in value was a negative $12,705.00 (the negative equity).  [*Id.*]

5. The total amount financed in the Contract is $29,239.04 at an annual interest rate of 16.95%. [Ex. A.]

6. On August 4, 2007, the Debtor filed her Chapter 13 petition.  [Doc. No. 1.]

7. On August 16, 2007, Wells Fargo filed a proof of claim in the amount of $27,577.46. [POC No. 1.]

8. On October 11, 2007, the Debtor filed an Amended Chapter 13 Plan (the Plan) which proposes a strip-down value of $15,537.18 for the 2006 car and an interest rate of 10.25%. [Doc. No. 26.] The Plan classifies the balance of Wells Fargo's claim as a general unsecured claim.  [*Id.*]  The Plan will pay only a 4% dividend to unsecured creditors.

9. On March 10, 2008, Wells Fargo filed an Objection to Confirmation of Debtor's Amended Plan (the Objection).  [Doc. No. 54.]  In the Objection, Wells Fargo asserts that, pursuant to 11 U.S.C. § 1325, the Debtor is not permitted to "cram down" its claim; rather, the Debtor must treat the entire claim, including the negative equity, as a fully secured claim. [*Id.*]

10.    On April 25, 2008, the Debtor filed her Brief in Opposition to the Objection. [Doc. No. 64.] The Debtor argues that the negative equity included in the Contract is not subject to § 1325 because it is not possible for Wells Fargo to have a PMSI in negative equity. [*Id.*]

11.    On May 21, 2008, the Court held a hearing on the Objection at which counsel for both parties made oral arguments. At the conclusion of the hearing, the Court took this matter under advisement.

## III.    Conclusions of Law

### A.    Negative equity may not be secured by a PMSI and is not protected by the hanging paragraph.

The "hanging paragraph," which is located between § 1325(a)(9) and § 1325(b), states:

> For purposes of paragraph (5), section 506 shall not apply to a claim described in that paragraph if the creditor has a purchase money security interest securing the debt that is the subject of the claim, the debt was incurred within the 910-day preceding the date of the filing of the petition, and the collateral for that debt consists of a motor vehicle (as defined in section 30102 of title 49) acquired for the personal use of the debtor, or if collateral for that debt consists of any other thing of value, if the debt was incurred during the 1-year period preceding that filing.

Thus, the hanging paragraph of § 1325 prohibits the bifurcation of a claim under § 506 if the following four requirements are satisfied: (1) the creditor holds a purchase-money security interest which secures a debt; (2) the debt was incurred within 910 days of the filing of the petition; (3) the collateral securing the debt is a motor vehicle; and (4) that motor vehicle was acquired for the personal use of the debtor. In the case at bar, the parties agree that the final three of these requirements are present, and that the only disputed issue is whether the meaning of the phrase "a

4

purchase money security interest securing the debt that is the subject of the claim" includes negative equity.[3]

Since the Bankruptcy Code does not define the term "purchase-money security interest," courts have turned to state law to find a meaning of purchase-money security interest, particularly their respective states' version of the Uniform Commercial Code (UCC). *See, e.g., Sanders*, 377 B.R. at 843; *Steele*, 2008 Bankr. LEXIS 1851, at * 6-8; *Bradlee*, 2007 Bankr. LEXIS 3863, at *6-7. The Texas version of the Uniform Commercial Code states that "[a] security interest in goods is a purchase-money security interest to the extent that the goods are purchase-money collateral with respect to that security interest." TEX. BUS. & COM. CODE ANN. § 9.103(b)(1). Purchase-money collateral is further defined as "goods or software that secures a purchase-money obligation incurred with respect to that collateral." TEX. BUS & COM. CODE ANN. § 9.103(a)(1). Finally, a purchase-money obligation is defined as "an obligation of an obligor incurred as all or part of the price of the collateral or for value given to enable the debtor to acquire rights in or the use of the collateral if the value is in fact so used." TEX. BUS & COM. CODE ANN. § 9.103(a)(2). Thus, the Court must determine whether negative equity is an obligation that is either (1) part of the price of the collateral; or (2) value given to enable the debtor to acquire rights in or the use of the collateral.

Comment 3 to § 9.103 states that, for purposes of § 9.103(a)(2), "the 'price' of collateral or the 'value given to enable' includes obligations for expenses incurred in connection with acquiring

---

[3] The term negative equity is not defined in the Bankruptcy Code, the Uniform Commercial Code, or Black's Law Dictionary. It is a term commonly used in the automobile lending industry to describe the difference between the balance owing on a trade-in vehicle and the value of that vehicle. *Peaslee*, 373 B.R. at 255 (defining negative equity as "the difference between the vehicle's outstanding loan balance and its market value"). For example, if the borrower owes $10,000.00 on his trade-in vehicle and the lender on the second vehicle gives the borrower a credit of $8,000.00 for the trade-in, there is $2,000.00 of negative equity. This amount is usually included in the total amount financed in the second loan. As previously stated, the negative equity in the transaction in the case at bar equaled $12,705.00.

rights in the collateral, sales taxes, duties, finance charges, interest, freight charges, costs of storage in transit, demurrage, administrative charges, expenses of collection and enforcement, attorney's fees, and other similar obligations." Comment 3 further states that "[t]he concept of 'purchase-money security interest' requires a close nexus between the acquisition of collateral and the secured obligation." TEX. BUS. & COM. CODE ANN. § 9.103, cmt. 3.

A frequent refrain in the cases holding that negative equity is not part of a PMSI is that the payment of old loans by the new lender is "merely an accommodation which facilitates each transaction" rather than "value given to enable the debtor to acquire rights in or the use of the collateral." *In re Westfall*, 365 B.R. 755, 760 (Bankr. N.D. Ohio 2007) (amended on unrelated grounds at 376 B.R. 210); *see also In re Blakeslee*, 377 B.R. 724, 729 (Bankr. M.D. Fla. 2007); *In re Conyers*, 379 BR 576, 582 (Bankr. M.D.N.C. 2007); *In re Peaslee*, 358 B.R. 545 (Bankr. W.D. N.Y. 2006) (reversed by *GMAC v. Peaslee*, 373 B.R. 252 (W.D.N.Y. 2007)); *In re Price*, 363 B.R. 734 (Bankr. E.D.N.C. 2007); *In re Acaya*, 369 B.R. 564, 570 (Bankr. N.D. Cal. 2007). The Court agrees with the characterization of the purchase of the new vehicle and the refinancing of the negative equity in the old vehicle as two separate and distinct transactions. *Price*, 363 B.R. at 741 ("there are simply two separate financial transactions memorialized on a single retail installment contract document for the convenience of some consumers and to allow the auto industry to sell more vehicles"). This second transaction, paying off the balance due on the first vehicle's loan, has accurately been described as a "convenient but unnecessary option for a consumer purchasing a replacement vehicle." *Peaslee*, 358 B.R. at 557. Simply put, although the refinancing of negative equity is increasingly commonplace and makes such transactions practical, it is not a legal requirement for the debtor to acquire rights in the collateral and therefore does not "enable" the

acquisition of rights in the new vehicle. *See In re Mitchell*, 379 B.R. 131, 137-38 (Bankr. M.D. Tenn. 2007); *Sanders*, 377 B.R. at 855 (noting that the value must be used to acquire rights in the collateral, as opposed to simply enabling the transaction in general); *In re Look*, 383 B.R. 210, 219 (Bankr. D. Me. 2008) ("The value advanced by [the car lender] enabled [the debtor] to refinance the obligation secured by her trade-in. And, as a consequence, [the car lender] obtained clear rights to the trade-in. It did not 'enable' [the debtor] to purchase her new car.").

The Court also agrees with the line of cases rejecting the argument that these two separate transactions—the purchase of the second car and the refinancing of the negative equity—share a "close nexus" as required by Comment 3 to § 9.103. *In re Pajot,* 371 B.R. 139, 154 (Bankr. E.D. Va. 2007) ("The lender could just as easily pay off the debtor's student loans and roll that amount into a secured claim on the second vehicle. The only possible nexus is that the purpose of the first debt was to acquire a vehicle, and the second debt is also to acquire a vehicle."); *In re Hayes*, 376 B.R. 655, 673 (Bankr. M.D. Tenn. 2007) (noting that the funds advanced to pay off the negative equity did not actually go to the debtor, but went directly to the prior lender); *In re Johnson*, 380 B.R. 236, 247 (Bankr. D. Or. 2007) (holding that the negative equity portion of the transaction is "nothing more than a refinance of the pre-existing debt owed," and therefore did not create a close nexus).

Generally, the cases that have relied upon the UCC for a definition of PMSI have expressly refused to consider any other state statutes under the doctrine of *in pari materia*.[4]  *See, e.g., Blakeslee*, 377 B.R. at 728; *Acaya*, 369 B.R. at 570; *In re Lavigne*, 2007 Bankr. LEXIS 4187, at *24 (Bankr. E.D. Va. Nov. 14, 2007).  Before the doctrine of *in pari materia* is invoked, the statutes must

---

[4] *In pari materia* is "a canon of construction that statutes that are *in pari materia* may be construed together, so that inconsistencies in one statute may be resolved by looking at another statute on the same subject." BLACK'S LAW DICTIONARY 794 (7th Ed. 1999).

either "concern the same subject, relate to the same person or class of persons, or have the same object or purpose." *In re J.M.R.*, 149 S.W.3d 289, 292 (Tex. App.—Austin 2004, no pet.) (citing *Cheney v. State*, 755 S.W.2d 123, 126 (Tex. Crim. App. 1988)).

In the case at bar, Wells Fargo requests this Court to read Chapter 348 of the Texas Finance Code, which regulates Motor Vehicle Installment Sales, *in pari materia* with § 9.103 of the UCC. This exact argument regarding the same provision of the Texas Finance Code was also made by the creditor in *Sanders*.  Judge Clark refused to consider this statute because it does not concern the same subject matter as the UCC. "[T]he chapter does *not* in any meaningful way address the question of security interests, their nature, or their extent. Instead, the Finance Code addresses the unique issues regarding what may be financed, how finance charges are to be computed, and how financing and charges are to be disclosed to retail purchasers of motor vehicles. In short, it is a consumer protection statute." *Sanders*, 377 B.R. at 849 (emphasis in original); *see also Blakeslee*, 377 B.R. at 729 (discussing an equivalent Florida consumer protection statute); *Acaya*, 369 B.R. at 570 (discussing an equivalent California consumer protection statute).  However, *Sanders* went on to analyze the relevant provisions of Chapter 348 of the Texas Finance Code and concluded that, even if the statute is applicable under the doctrine of *in pari materia*, it would not support the inclusion of negative equity as part of the price of the collateral.  Negative equity is not addressed in Chapter 348 under the subsection discussing price.  Thus, Judge Clark concluded that:

> The structure of section 348.006 employed by the Texas Legislature thus favors the debtors' view rather than [the creditor's]—a retail installment contract may include (and properly disclose) financing for two separate items: (1) the price of the vehicle being purchased, and (2) the cost of paying off any negative equity from the trade-in. That, in turn, favors a conclusion that 'price of the collateral,' roughly equivalent to 'cash price of the motor vehicle,' does not include the amount advanced to pay off negative equity, even though that amount is allowed to be financed.

*Sanders*, 377 B.R. at 851.

8

The Court concurs with Judge Clark's analysis in both respects. Chapter 348 of the Texas Finance Code is essentially a consumer protection act and therefore should not be read *in pari materia* with the UCC. Moreover, even if it were appropriate to consider, the text of Chapter 348 does not support a finding that negative equity should be included as part of the price of the collateral.

Finally, many courts have concluded that negative equity is not similar to the types of obligations expressly listed in Comment 3 to § 9.103 ("sales taxes, duties, finance charges, interest, freight charges, costs of storage in transit, demurrage, administrative charges, expenses of collection and enforcement, attorney's fees, and other similar obligations"); *Sanders*, 377 B.R. at 855 (applying the principle of *ejusdem generis* to the list and concluding that the items listed "are closely connected with the purchase of the vehicle itself" or are "costs normally associated with the enforcement of the security interest once granted," but that negative equity is neither); *see Blakeslee*, 377 B.R. at 729 ("the legislature's failure to include negative equity in the text of the U.C.C. or in the official comments thereto despite the increasingly common financing of negative equity is not an oversight and does not provide justification for the Court to 'place[] it amongst a list which would be the proverbial elephant in the room'") (quoting *Westfall*, 365 B.R. at 760); *Pajot*, 371 B.R. at 152 ("the fact that negative equity payoff is neither necessary nor compelled 'cuts against' its inclusion with the list of expenses contained in Official Comment 3. This is further reinforced by the fact that negative equity is of a different type and magnitude from the other listed items."); *Conyers*, 379 B.R. at 582 ("Neither money advanced to pay negative equity nor obligations of a similar nature are included in this list. The examples given in Comment 3 are items that are directly associated with the purchase and retention of a new vehicle or other collateral. The court does not believe that payment of a pre-existing debt secured by other collateral is similar to those items."). The Court

9

agrees with this analysis. Negative equity is not a similar obligation to the enumerated list in Comment 3 to § 9.103 because it is unrelated to the acquisition of or retention of the subject vehicle. Instead, as previously stated, this is essentially a second transaction (i.e. refinancing of debt) that is simply included in one set of disclosures for the convenience of both parties.

To review, the Court concludes that negative equity is not an obligation which can be secured by a PMSI for the foregoing reasons: (1) refinancing the negative equity does not "enable" the debtor to acquire rights in the collateral (i.e. the second vehicle); (2) as such, the two transactions do not share a "close nexus" as required by Comment 3 to § 9.103; (3) the definition of price used in the Texas Motor Vehicle Installment Sales Act is not relevant because it is essentially a consumer protection act; and (4) negative equity is not sufficiently similar to the enumerated list in Comment 3 to § 9.103. Throughout the discussion so far, the Court has been in agreement with the cases from the Northern, Western, and Southern Districts of Texas.[5] However, in *Sanders*, the Western District's analysis diverges in a direction that this Court cannot follow.

**B.      The dual-status rule should be applied to the negative equity.**

Since the Court has found that the negative equity is not protected as part of the PMSI securing the vehicle, the next issue is how should that negative equity be addressed. The Court's analysis above relied heavily upon cases from bankruptcy courts within Texas, but cited to cases in many other states because each of those cases analyzed provisions of nearly identical state UCC statutes and vehicle installment sales acts. Here, however, the Court is exclusively focused on cases

---

[5] The Court has not extensively discussed *Steele* from the Northern District of Texas. This is not an oversight or a slight to Judge Lynn. The bulk of *Steele* is focused on the second issue. Since *Dale* and *Sanders* are essentially in agreement as to the first point, *Steele* does not delve into the first issue other than to say it generally agrees with the analysis in both cases. One interesting point that *Steele* does make regarding the first issue is that "the added recovery provided to a car financier by reason of the [the hanging paragraph] will, in some cases, be at the expense not of the debtor but rather of general unsecured creditors. *Steele*, 2008 Bankr. LEXIS at *11. Given this fact, *Steele* states that the hanging paragraph should be narrowly construed as an exception to the general rule. *Id*. at *12.

from within Texas because the decision of whether to apply the dual-status rule or the transformation rule is heavily influenced by Texas state court decisions.

Comment 3 to § 9.103 describes the dual-status rule as follows: "[a] security interest may be a purchase-money security interest to some extent and a non-purchase-money security interest to some extent." For non-consumer goods transactions, § 9.103(f) explicitly adopts this rule and rejects the alternative transformation rule. Under the transformation rule, "any cross-collateralization, refinancing, or the like destroys the purchase-money status entirely." TEX. BUS. & COM. CODE ANN. § 9.103, cmt. 3. Section 9.103(h) states that in consumer goods transactions, which include the subject vehicle purchase in this case, the UCC intends to allow courts to determine whether to apply the transformation or dual-status rule.

*Sanders* does not actually stand for the proposition that the transformation rule should be applied, but the end result is identical to the result under that rule. Judge Clark argues that the decision between these rules is appropriate only in a state law context and is inapplicable to the interpretation of hanging paragraph. *Sanders*, 377 B.R. at 858. He relies on the plain meaning of the hanging paragraph which states "*if* the creditor has a purchase money security interest securing *the debt* that is the subject of the claim" (emphasis in original). Judge Clark notes that the lender has a PMSI securing only part of the debt, but not the entire debt. *Id.* at 859. *Sanders* claims that the absence of the phrase "to the extent of" or similar language is crucial, and that without such limitation the debt is protected by the hanging paragraph only if the entire debt secured by a PMSI. The support for this narrow construction is drawn from case law addressing 11 U.S.C. § 1322(b)(2), which states that "a plan may modify the rights of holders of secured claims, other than a claim secured only by a security interest in real property that is the debtor's principal residence." The Third Circuit interpreted this language to mean that if a security interest was taken in anything other

11

than property which was solely the principal residence of the debtor, then it was not protected by §

1322(b)(2). *Scarborough v. Chase Manhattan Mortgage (In re Scarborough)*, 461 F.3d 406 (3d Cir.

2006).

While there are similarities between the carve-outs in the hanging paragraph and §

1322(b)(2), the Court cannot agree that these similarities are sufficient to find that the "plain

meaning" of the hanging paragraph requires courts to apply a functional equivalent of the

transformation rule, particularly when § 1322(b)(2) contains the word "only" and the hanging

paragraph contains no such modifying phrase. *See Steele*, 2008 Bankr. LEXIS at *15 ("the word

'only' is more clearly restrictive than the word 'if'"). Judge Clark believes that the omission of a

modifying phrase such as "to the extent that" before the words "the debt" in the hanging paragraph

mandates that the entire debt must be subject to the PMSI. This Court respectfully disagrees and

does not believe that this omission can be forced into a plain meaning. *Steele* points out that the

inclusion of language such as "to the extent that" would "cloud the meaning Congress intended" and

"risk a construction of the provision that would allow the very lien stripping Congress meant to

prevent." *Id.* at 19. Thus, this Court rejects *Sanders'* reading of the language in the hanging

paragraph and instead turns, as most courts have, back to the language of the UCC, which grants

state courts the discretion to determine whether to apply the transformation or dual-status rule in

consumer goods transactions. TEX. BUS. & COM. CODE ANN. § 9.103(h).

*Dale* notes that several Texas courts have adopted the transformation rule in the context of

a consumer goods transaction. Slip op. at 8-9 (citing *Borg-Warner Acceptance Corp. v. Tascocsa*

*Nat'l Bank*, 784 S.W.2d 129 (Tex. App.—Amarillo, 1990, writ denied) and *In re Manuel*, 507 F.2d

990 (5th Cir. 1975)). However, Bankruptcy Judge Brown did not follow these cases because their

application of the transformation rule was based upon an "underlying policy . . . to prevent

overreaching creditors from retaining title to all items covered under a consolidation contract until the last item purchased is paid for." *Dale*, slip op. at 10 (quoting *Borg-Warner*, 784 S.W.2d at 134-35).[6] However, the situation in the case at bar (rolling negative equity into the purchase of a new vehicle) is significantly different from the cases cited, which typically involve ongoing purchases such as furniture. *See In re Gonzales*, 206 B.R. 133 (Bankr. N.D. Tex. 1997) (citing *Roberts Furniture Co. v. Pierce (In re Manuel)*, 507 F.2d 990 (5th Cir. 1975)). There is no after-acquired property clause in the Contract and, in the context of consumer vehicles, that type of subsequent transaction would be extremely rare. The transaction between the Debtor and Wells Fargo is closed; there is no floating lien which will attach to future purchases.

Accordingly, the Court concludes, as Judge Brown did in *Dale*, that application of the transformation rule is unnecessary because there is no after-acquired property clause and the collateral will not secure later indebtedness. *See Borg-Warner*, 784 S.W.2d at 134. Wells Fargo was not trying to overreach by refinancing the negative equity and should not be punished by application of the unforgiving transformation rule. Instead, the Court adopts the more "sensitive" dual-status rule. *Id.* at 135.

### C.    Calculations under the dual-status rule

Finally, the Court must use the dual-status rule to calculate the actual amount which is protected from bifurcation by the hanging paragraph. Several courts have prorated the prepetition reduction of principal by determining what percentage of the total amount originally financed qualified as a purchase-money obligation. *Steele*, 2008 Bankr. LEXIS at *25-26; *In re White*, 352 B.R. 633, 648 (Bankr. E.D. La. 2006); *Dale*, slip op. at 11.

---

[6] After rejecting the *Sanders* reading of the hanging paragraph, *Steele* applies the dual-status rule without any discussion of the transformation rule. *Steele*, 2008 Bankr. LEXIS 1851, at *26 (citing *Dale*, slip op. 11).

The total amount financed under the Contract was $29,239.04. [FOF No. 5.] This amount already includes a deduction for the Debtor's cash down payment and a manufacturer's rebate. Of this amount, $12,705.00 represents the negative equity owed on the 2004 car, which this Court has concluded is not protected under the hanging paragraph. [FOF No. 4.] Thus, the total amount that constituted a purchase-money obligation was $16,534.04 ($29,239.04 – $12,705.00)—which represents 56.5% of the total amount financed. As of the petition date, Wells Fargo was owed $27,577.46. [FOF No. 7.] Therefore, $15,581.26 (i.e. $27,577.46 x .565) of Wells Fargo's claim is protected under the hanging paragraph.    The Plan lists Wells Fargo's secured claim as only $15,537.18.    While the difference between these two amounts (i.e. between $15,581.26 and $15,537.18) may seem *de minimis*, the hanging paragraph is clear that the Debtor has no power to strip down debt secured by a PMSI on the 2006 car by even one cent. Therefore, the Court sustains Wells Fargo's objection to confirmation. The Debtor shall have ten days from the entry of this Memorandum Opinion to amend the Plan and list Wells Fargo's claim as secured in the amount of $15,581.26.

## IV.    Conclusion

In *Sanders*, Judge Clark astutely paraphrased a quintessentially Texan rule: courts are to be governed by rules of common sense. 377 B.R. at 852 (citing *In re Amber's Stores, Inc.*, 205 B.R. 828 (Bankr. N.D. Tex. 1997)). Ultimately, this Court's decision is driven by common sense. The purpose of the hanging paragraph is to remedy a perceived abuse by debtors who would purchase a new vehicle shortly before, or even on the eve of, filing a bankruptcy petition and then immediately strip down the secured claim of the vehicle lender as part of their Chapter 13 plan. It was not designed to address the behavior of either the debtor or the lender in circumstances such as the case at bar. As *Steele* noted, "it makes no sense to read the provision so strictly that any mix of

14

non-purchase money debt would taint the whole and cost the lender the protection Congress intended." *Steele*, 2008 Bankr. LEXIS at *21.   Likewise, holding that negative equity is fully protected by the hanging paragraph would be overly harsh towards well-meaning debtors.

The act of refinancing negative equity in one transaction with a new car purchase is not an abuse that the hanging paragraph was designed to address.   The increasing pervasiveness of negative equity in this industry supports such a finding.   This is not a new practice that has arisen since October 2005 when BAPCPA became effective.   Congress was clearly aware that such a practice existed and could have included more explicit language in BAPCPA if it so desired; it did not do so. Thus, in light of the general goal of the hanging paragraph and the arguments outlined herein, the Court finds that the most equitable solution to this problem is to exclude negative equity from the protection of the hanging paragraph and to apply the dual-status rule to protect the proper amount of the PMSI held by the lender.   An Order consistent with this Memorandum Opinion shall be entered on the docket simultaneously with the entry of this Memorandum Opinion.

Signed on this 22nd day of July, 2008.

Jeff Bohm
U.S. Bankruptcy Judge